INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Plaintiff,

v.

UNITED TELEPHONE COMPANY OF FLORIDA, Defendant.

No. 72–17–Civ.–F.M.–K.

United States District Court, M. D. Florida, Fort Myers Division.

Sept. 8, 1975.

Blecher, Collins & Hoecker, Los Angeles, Cal., Daniel R. Solin, New York City, for plaintiff by Maxwell M. Blecher; Cromwell A. Anderson, Smather & Thompson, Miami, Fla., Peter J. Winders, Tampa, Fla., of counsel.

Anderson, Russell, Kill & Olick, New York City, for defendant by Lawrence Kill, Jerold Oshinsky, New York City; Warren E. Baker, Kansas City, Mo., John Germany, Holland & Knight, Tampa, Fla., Edwin L. Mason, Mason & Erwin, Tallahassee, Fla., of counsel.

PALMIERI, District Judge.[1]

### Preliminary Statement

The plaintiff, International Telephone and Telegraph Corporation (ITT), although engaged in various lines of business is, for purposes of this lawsuit, a substantial manufacturer and distributor of telephone equipment. The defendant, United Telephone Company of Florida (United), is an operating telephone company enfranchised by the State of Florida and furnishing exclusive telephone services to subscribers within an area comprising 13 counties, including the cities of Fort Myers and Tampa.

ITT charges United with the unlawful use of its monopoly power by allegedly stifling competition in the sale and distribution of telephone equipment in violation of Section 2 of the Sherman Act. Specifically it claims that United brought about the cancellation of a sales contract of ITT for telephone equipment as a result of anticompetitive motivations.

The controversy came about as the result of the construction of an extensive real estate development in the Fort Myers area covering more than 75 acres, known as Shell Point Village (the Village). The development was established as a retirement community but included important lodging, shopping and other facilities available to the public generally, including 200 room motel, a restaurant and a marina. A suitable communications system was required so as to permit internal telephone calls between the many component units of the Village and between them and points outside the Village. A proposed solution was offered by ITT through the use on the Village premises of central office equipment which it would supply. The equipment was intended to permit intra-state and inter-state communications by tele-

---

1. Of the Southern District of New York, sitting by designation.

phone through an interconnection with the licensed system of United. The contemplated arrangement would have provided service in and out of interconnected trunk lines of United for the benefit of residents, guests, businesses and the general public at the Village.

Since the Village was not a telephone company and had no required certificate from the State of Florida, it could not, under Florida statutes, sell telephone services to its residents (except for internal communications) because this would constitute the use of customer-owned equipment to resell telephone services to others. Since the proposed installation at the Village could not be made operative without the interconnection with the trunk lines and general facilities of United, it was a matter of some importance to United and to all concerned that compliance with Florida law be determined.

The matter was placed before the appropriate forum, the Florida Public Service Commission, by United on July 24, 1970, on notice to the Village. United's complaint alleged its belief that the Village's proposed telephone system would involve resale of services without a certificate in contravention of statute and in violation of United's tariff. United also informed the Commission by letter that because some of the contemplated uses of the telephone system were lawful it believed that it was obliged to interconnect, which it was fully prepared to do, and to seek interdiction by the Commission of the unlawful conduct.

On August 7, 1970, the Commission entered a show cause order against the Village, to which the Village did not respond. However, by answer filed September 9, 1970, the Village denied that its telephone services would be "for hire" and moved to dismiss United's complaint. The motion was denied. On November 20, 1970, the Commission granted intervention to ITT in support of the Village and to General Telephone Company of Florida, Florida Telephone Corp. and Southern Bell Telephone and Telegraph Company in support of United. On November 27, 1970, ITT filed an answer denying that the telephone system which it proposed to sell the Village would be used for resale of services and moving to dismiss United's complaint. This motion was also denied. Neither the Village nor ITT sought review of the show cause order or the denials of their motions to dismiss. ITT was dilatory in its discovery, serving interrogatories on United one year after intervention was granted. ITT failed to place before the Commission any of the factual matters or legal theories which it now urges upon this court, and was finally dismissed as an intervenor on April 7, 1972, on the ground that its contract with the Village, which formed the basis for its intervention, had been cancelled.[2] ITT never sought review of the order of dismissal.

This proceeding was ultimately terminated as moot when, after it had been pending over a year and a half, the Village abandoned its intention of installing a telephone system. During the entire pendency of the proceedings before the Commission, ITT, despite early intervention, never pressed for the adjudication of any issue and played a largely inactive and ineffective role. The Commission expressly stated in its final order, however, that had the Village's proposal been found to involve the resale of services, as ITT conceded at the trial of this lawsuit that it did, it would have been in violation of Florida law because of the lack of a certificate of public convenience and necessity.

The findings of fact and conclusions of law which follow are intended to amplify and supplement what has already been said and to demonstrate that United is entitled to judgment dismissing the action of ITT against it, and that its counterclaims against ITT must be dismissed.

---

2. The Village cancelled its contract with ITT on January 28, 1972, after ITT rejected the Village's proposal that it install a portion of the proposed system for those uses which were clearly lawful.

## FINDINGS OF FACT

### I. *The Parties*

1. Plaintiff International Telephone and Telegraph Corporation (ITT) is a Delaware corporation with its principal place of business in New York City, New York, which manufactures and sells telephone equipment.

2. Defendant United Telephone Company of Florida (United) is a Florida corporation with its principal place of business in Fort Myers, Florida, which provides exclusive telephone service to all or part of 13 counties in the State of Florida under a certificate of public convenience and necessity issued by the Florida Public Service Commission (PSC or the Commission).

3. ITT does not have a certificate of public convenience and necessity to operate a telephone company within the area served by United in the State of Florida.

### II. *Shell Point Village*

4. The controversy involves a proposed telephone system for Shell Point Village (the Village), a large real estate development covering more than 75 acres of land near Fort Myers, Florida, within the United telephone service area.

5. The Village was established by the Alliance Development Association. It was built and is operated by the Christian and Missionary Foundation[3] as a nonprofit retirement community which includes, in addition to its residential facilities, a 200 room motel, restaurant, marina, nursing pavilion, business concessions and other facilities available and advertised to the public generally.

6. The Village's residents pay an initial fee designated as a "Founder's Gift" and then pay a monthly fee to cover the Village's operating and maintenance expenses.

7. Immediately adjacent to the Village is a residential subdivision known as Palm Acres which, though not a part of the Village, is the residence of certain of its medical and administrative employees.

### III. *The ITT-Shell Point Village Contract*

8. On February 11, 1970, ITT and the Village entered into a contract under which ITT was to provide and install specifically designated customer-owned telephone equipment at the Village.

9. This equipment was to serve not only as an internal communications network within the Village, but ITT warranted that the equipment could lawfully be used to serve the businesses, administrative needs and residents of the Village by providing interconnection with the telephone company's network to allow for incoming and outgoing local, intra-state and interstate telephone service.

10. The equipment was also to be installed in the homes of four Village employees in Palm Acres. Although intended as an internal communications link for emergencies, the Palm Acres residents would have had complete telephonic access to the Village's residents and businesses through the Village's private telephone system, and there was no effective means to prevent calls from Palm Acres to persons outside the Village on Village equipment.

11. Equipment which connects individual telephones of a user with one another and with the public network of the operating telephone company in whose area the subscriber is located is known as a private branch exchange (PBX).

12. By letter dated April 30, 1970, the Village notified United of its contract with ITT for a telephone system to be operational by August 8, 1970, and advised that technical specifications could be obtained from ITT.

13. Both ITT and the Village refused to supply the technical information which United sought immediately upon this notification unless United agreed to waive the use of an interface or coupling device between the ITT system and the United lines.

---

**3.** Although the telephone system contract for the Village was actually between ITT and the Foundation, for purposes of this opinion there is no significant distinction between the Village and the Foundation and they are referred to as the Village.

14. United considered the use of an interface device, which was and is uniformly required in all interconnection situations in Florida, essential to the protection of its equipment, and in order to be prepared to interconnect on the August 8, 1970 deadline purchased an interface device from the Bell system, although the refusal of ITT and the Village to disclose technical information made it impossible to insure that the device was fully compatible with the Village's equipment.

15. With a view to possible interconnection, United filed an interconnection tariff[4] with the PSC on April 29, 1970, which was approved June 7, 1970. The tariff permitted interconnection for lawful purposes and did not permit an interconnected subscriber to provide a telephone system to other telephone company subscribers or the public.

16. The ITT PBX equipment was not in the State of Florida on August 8, 1970, and between that time and the ultimate cancellation of its contract with the Village, ITT installed no telephone equipment at the Village.

17. The Village terminated its contract with ITT on January 28, 1972, because ITT rejected the Village's proposal that ITT install a portion of the originally proposed system for those uses which were clearly lawful. See findings 42–44, *infra*.

IV. *Payment for Shell Point Village Telephone Service*

18. When the Village decided to provide telephone service to residents through the ITT PBX, it recognized that this utility service constituted an unanticipated cost (it having originally been intended that residents would be serviced directly by United) and raised its Founder's Gift and monthly fee schedules accordingly to cover the installation and operating costs of the PBX. In addition, toll calls between Village residents and points outside the local exchange area were to be charged to residents individually.

19. Charges to Village residents for telephone service furnished to them through Village customer-owned equipment constituted a resale of services.

20. Under Florida law the Village could not use customer-owned equipment to resell telephone services to the public in the absence of a certificate of public convenience and necessity. Florida Statutes, Chapter 5, § 364, Part I.

21. Neither the Village nor its owners, Alliance Development Association and the Christian and Missionary Foundation, have ever possessed or even sought a certificate of public convenience and necessity.

V. *The Florida Public Service Commission Proceeding*

22. At a meeting attended by representatives of the Village, ITT and United on June 10, 1969, United contended, as it has at all times subsequent thereto, that installation and operation of a PBX to serve residents, for which they would be charged, might constitute an unlawful "resale of services" in violation of the Florida statutes, Chapter 5, § 364, Part I, requiring a certificate of public convenience and necessity for the resale of such telephone services.

23. At that time the Village and ITT denied that the Village would charge residents for the installation and provision of telephone communication services provided to them through the PBX.

24. In May, 1970, United commenced an investigation into the legality of the Village's proposed installation of customer-owned telephone equipment under the direction of Warren E. Baker, Esq., then Senior Vice President and General Counsel of United's parent company, United Telecommunications. Mr. Baker had been General Counsel to the Federal Communications Commission. He has an extensive background in common carrier and communica-

4. A "tariff" is a public document setting forth the services of the carrier being offered, the rates and charges with respect to the services and the governing rules, regulations and practices relating to those services.

tions law. He was a credible and persuasive witness.

25. Based on his review of the entire Shell Point Village situation and extensive legal research, Mr. Baker concluded in good faith and upon reasonable grounds, that the proposed telephone system would violate Florida statutes, PSC rules and regulations and United's tariff.

26. On June 24, 1970, on notice to the Village, United filed a factually accurate complaint with the PSC together with a letter stating United's readiness to interconnect and setting forth the reasons for commencing the proceeding.

27. United's complaint alleged its belief that the Village's proposed PBX system would involve resale of telephone services without a certificate in contravention of statute and in violation of United's tariff which permitted interconnection of customer-owned equipment solely for use by the subscriber, its relatives and employees, and not for hire to the public.

28. United's letter stated that it was nonetheless prepared to interconnect because some of the uses contemplated by the Village were lawful and United "believes it has no alternative under its obligation to provide telephone service to the public within its service area but to connect telephone service to this subscriber and seek interdiction of the unlawful conduct by the Commission."

29. On August 7, 1970, the PSC entered an order directing the Village to "cease and desist . . . or show cause" on September 7, 1970, "why it should not cease and desist" from the acts alleged to be unlawful in United's complaint.

30. The Village did not seek rehearing or reconsideration of this order by the PSC or certiorari to the Florida Supreme Court, even though ITT, with which the Village was in close legal collaboration, had been advised by its PSC counsel that such a procedure was available.

31. The Village did not show cause on September 7, 1970, or request a hearing, but on September 9, 1970, filed an answer to United's complaint denying that its proposed telephone system was "for hire," claiming that the system was being paid for by the Village and not its residents, and alleging that telephone service between the Village and Palm Acres would be mechanically restricted so as to prevent Palm Acres residents from reaching lines outside the Village.

32. The Village's answer included a motion to dismiss United's complaint, which was denied by order dated November 20, 1970, after oral argument.

33. On September 18, 1970, ITT sought to intervene in the PSC proceeding on the ground that it had a contract to provide the equipment for the Village which was the subject matter of United's PSC complaint. This motion was granted over United's opposition by order dated November 20, 1970.

34. The November 20, 1970 order also granted petitions to intervene in support of United's complaint by General Telephone Company of Florida, Florida Telephone Corporation and Southern Bell Telephone and Telegraph Company. ITT never sought review of the order granting intervention to the three telephone companies.

35. On November 27, 1970, ITT filed an answer to United's complaint denying that ITT's equipment "is to be used and operated to facilitate the business of affording telephonic communications service to the public for hire" and moving to dismiss United's complaint.

36. By PSC order dated January 15, 1971, ITT's motion to dismiss the United complaint was denied. ITT did not seek review of this order.

37. At no time subsequent to its intervention did ITT itself seek any review of the cease and desist order directed to the Village. See finding 30, *supra.*

(i) *Discovery Conducted During the PSC Proceeding*

38. Although the PSC, over United's opposition, by order dated December 9, 1970, granted the Village's motion to take the depositions of United personnel, the Village

never sought the requisite witness subpoenas nor did it seek depositions of United personnel.

39. ITT did not serve interrogatories on United until November 24, 1971, one year after intervention was granted. United answered these interrogatories on January 24, 1972.

40. Answers to United's March 1971 interrogatories, the only discovery sought by United, were not served until December 27, 1971, in behalf of ITT; or until December 30, 1971, in behalf of the Village.

### (ii) *The Village's Motion to Amend the Order to Show Cause*

41. On July 15, 1971, the Village filed a motion to "amend" the PSC's August 7, 1970 order so as to exclude from that order (a) communication services involving the Village and its employees, administrative offices and transient guests, (b) a Village intercommunication system wholly confined to the Village not to be used in conjunction with any telephone service or facility provided by United, and (c) interstate telephone service.

42. United responded to the Village's motion that the show cause order needed no amendment because it did not restrict the acts set forth in the motion to amend, and United had no objection to such proposed services.

43. By order dated September 13, 1971, the PSC denied the Village's motion to amend the August 7, 1970 order and stated:

"Although the Commission is denying this motion on procedural grounds, we feel constrained to inform the respondent . . . that the type of facilities they now wish to have authorized by an amended order are either lawful or outside our jurisdiction and obviously are not prohibited by the terms of Order No. 4927. In United Telephone Company of Florida, Inc.'s original Complaint, they [sic] made no reference to those communications services described in the Foundation's Motion but addressed itself solely to the acts alleged to be in violation of Chapter 364, Florida Statutes."

### (iii) *United's Efforts to Develop a Joint User Tariff*

44. During this period, United by its counsel Mr. Baker, engaged in serious efforts to develop a joint-user tariff which would allow service to residents of the Village through a customer-owned PBX.

45. After working through five drafts, Mr. Baker concluded in good faith that the proposed draft tariff would not be lawful.

46. Although it was entirely free to do so, ITT made no contention before the PSC that a joint-user tariff was lawful and could provide a basis for resolving the problem of the Village telephone system consistent with the prohibitions of Florida law.

### (iv) *Factual Matters Not Raised During the PSC Proceeding*

47. At an April 28, 1971 meeting among representatives of United, the Village and ITT to determine if an informal resolution of this case was possible, ITT asserted that General Telephone had a tariff which would permit the telephone service proposed for the Village.

48. Although General Telephone was an intervenor in the PSC proceeding, at no time during the proceeding did ITT make this assertion to the PSC.

49. In or about November, 1971, again during the pendency of the PSC proceeding, ITT learned that a United Telecommunications subsidiary other than United had sold PBX equipment for installation in Marina City, California, an extensive apartment complex.

50. At no time during the PSC proceeding did ITT or the Village bring this sale to the attention of the Commission.

51. At no time during the PSC proceeding did ITT allege any threats on the part of United personnel to the ITT–United business relationship, now alleged to have occurred after the signing of the ITT–Village contract and before United brought its PSC complaint.

### (v) *ITT's Electric Power Claim*

52. ITT now charges that United misled the PSC as to the applicable law by failing to draw its attention to the electric power case *Re Procedures Governing Sales of Electricity for Resale*, Florida Public Service Commission Docket No. 69319–EU, 85 P.U.R.3d 107 (1970), decided by the PSC three months prior to the filing of the United complaint.

53. The PSC is presumptively cognizant of its own regulatory decisions. Moreover, neither ITT nor the Village relied on this or similar electric power cases in the PSC proceeding.

### (vi) *Conclusion of the PSC Proceeding*

54. By order dated April 7, 1972, the PSC dismissed ITT as an intervenor on the ground that its contract with the Village, which formed the basis for its intervention, had been cancelled. See finding 17, *supra*.

55. On June 1, 1972, the Village moved to dismiss United's complaint on the basis that it had cancelled its contract with ITT for a customer-owned telephone system.

56. United opposed the motion to dismiss on the ground that its complaint did not oppose the sale of customer-owned equipment but was directed to that portion of the proposed private telephone system which violated Florida law, and that, at most, the docket ought to be closed and the proceeding terminated.

57. By order dated September 21, 1972, the PSC proceeding was "closed." The PSC made no actual determination as to whether the proposed system was or was not "for hire," but did state in its final order:

> "If in fact the telephone line, plant or system proposed to be acquired, constructed or operated by the Foundation is 'for hire' as alleged, a certificate from this Commission must first be obtained that the present or future public convenience and necessity does or will require such construction, acquisition or operation, as required by Section 364.33, Florida Statutes . . . ."

58. It was conceded at trial by ITT that the telephone system contemplated by the Village in fact involved telephone service for resale, and the evidence at the trial fully supports the allegation that the residents were to share in the cost of the proposed telephone system.

59. In its final order the PSC stated that while it was not reviewing the entire proceeding, it had considered all the pleadings, particularly the Village's and ITT's motions to dismiss, and the Village's motion to amend the show cause order. The Commission reaffirmed its earlier statements, stating that it was of the opinion that United's complaint sought only to prevent the Village from contravening the pertinent provisions of Florida statutes, the PSC's rules and regulations, and the rules and regulations of United on file with and approved by the PSC. The PSC further found that United had not sought to enjoin the Village from doing what it had a lawful right to do, nor was United's complaint in any way founded on the contract between the Village and ITT. The order stated that the issues in controversy were peculiar to the Commission's jurisdiction, and that since the issues had not been finally adjudicated, the Village's motion to dismiss was inappropriate. The PSC noted its continuing jurisdiction and surveillance of the area of controversy. Finally, the Commission determined to close the docket since the controversy had become moot, the Village not only having ceased and desisted as ordered, but having abandoned its plans to acquire and operate a telephone plant or system alleged to be in violation of state law, PSC rules and United's tariff.

60. The PSC proceeding began on July 24, 1970, and was closed on September 21, 1972. During the more than two years of its pendency, neither the Village nor ITT ever moved the PSC to hold a formal hearing on the merits.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this action, 15 U.S.C. § 15, and of the parties hereto.

2. ITT knew and was chargeable with the knowledge that Florida statutes prohibit a telephone system to serve the public for hire without a certificate of public convenience and necessity.

3. ITT knew and was chargeable with the knowledge that the proposed telephone system at Shell Point Village would serve the public for hire and would violate Florida law.

4. The proceedings instituted by United with the Florida Public Service Commission on July 14, 1970, were neither sham nor frivolous, within the purview of Rule 11 F.R.Civ.P. or *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961). The court rejects the contention of ITT that these proceedings were "sham" as defined by *Noerr*, i. e., intended merely "to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor . . . ." United presented in good faith a justiciable controversy under Florida law upon factually accurate grounds over which the Commission had regulatory power.

5. ITT failed to avail itself of numerous opportunities during a period of over two years to litigate its alleged rights or present its contentions before the Florida Public Service Commission. It further failed to avail itself of the appellate procedures available under Florida law after the adverse decision of the Florida Public Service Commission. The role of ITT before this Commission was substantially one of passivity and inaction despite the fact that it sought and obtained the right to intervene at an early stage of the proceedings.

6. ITT is estopped from raising in this action any factual matters it could have but failed to raise in the Florida Public Service Commission proceedings as well as any factual matters determined by the Commission. *See Marine Terminal v. Rederi Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); *Tampa Phosphate R. Co. v. Seaboard Coast Line R. Co.*, 418 F.2d 387 (5th Cir. 1969); *CSI/Communication Systems, Inc. v. South Central Bell Telephone Co.*, 346 F.Supp. 487 (E.D.Tenn.1971).

7. The evidence adduced at trial and the applicable legal concepts abundantly support judgment for United dismissing ITT's causes of action, without considering the preclusion of any evidence offered by ITT.

8. There was no tortious interference by United with the Shell Point Village contract or any other contractual or commercial relationships of ITT.

9. United has not monopolized or attempted to monopolize interstate trade or commerce in any relevant market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. There is no basis for concluding on the record before this court that United violated the federal antitrust laws. None of the actions of United in this record was motivated by any anticompetitive purpose. The decision of the Supreme Court in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), is inapplicable.

10. United has failed to sustain its burden of proving that the intervention of ITT before the Florida Public Service Commission or its filing of this lawsuit was a wrongful or malicious abuse of process.

11. The complaint is dismissed with prejudice.

12. The counterclaims are dismissed with prejudice.

It is so ordered.

A proposed formal judgment may be submitted on notice if either party is so advised.