**NORTHERN STATES POWER COMPANY, Appellant,**

v.

**NORTH DAKOTA PUBLIC SERVICE COMMISSION and Cass County Electric Cooperative, Appellees.**

Civ. No. 920315.

Supreme Court of North Dakota.

June 18, 1993.

Daniel S. Kuntz (argued), of Zuger Kirmis & Smith, Bismarck, and Gene Sommers (appearance), Northern States Power Co., Minneapolis, MN, for appellant.

Charles E. Johnson (argued), Asst. Atty. Gen., Public Service Com'n, State Capitol, Bismarck, for appellee North Dakota Public Service Com'n.

John D. Kelly (argued), of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for appellee Cass County Elec. Coop.

MESCHKE, Justice.

Northern States Power Company [NSP] appeals from a district court judgment affirming orders by the Public Service Commission [PSC] that deny trade secret protection for information in contracts that NSP was required to file with the PSC. We affirm the PSC's denial of trade secret protection.

NSP operates and maintains a natural gas distribution system in eastern North Dakota and, since the mid–1980s, has offered interruptible transportation service to large volume customers of natural gas. Under its filed tariff for this service, NSP individually negotiates the price term of each gas transportation contract with an interruptible transportation customer. Part of NSP's tariff, its North Dakota Gas Rate Book Sheet No. G 15.1, states the general terms and conditions of its interruptible transportation service. The rate is a monthly fixed charge for the cost of billing and a meter in place, plus a price negotiated between NSP and the customer for the volumes transported over NSP's distribution system.

Each contract that is negotiated by NSP requires it and the customer to maintain the confidentiality of the price and volume information. That information usually consists of: (1) the total delivered price to a customer's facilities per thousand cubic feet of gas; (2) the number of cents per thousand cubic feet of gas for the minimum delivered cost and volume charge that NSP must recover, or otherwise be allowed to interrupt deliveries to the customer if natural gas prices rise; (3) the maximum number of thousand cubic feet of gas the customer expects to use daily; and (4) the average number of thousand cubic feet of gas the customer expects to use daily.

As directed by the PSC, NSP's Gas Rate Book Sheet No. G 15.1 requires that each "Gas Transportation Agreement" must be filed at the PSC within 20 days of the effective date of the agreement, and each agreement is deemed accepted by the PSC unless rejected within 20 days of filing. The filing requirement allows the PSC to determine if the contracted rates meet or exceed NSP's cost of the interruptible transportation service to the customer. When it files each agreement, NSP habitually deletes the price and volume data from the publicly filed copy and also applies to the PSC for trade secret protection to restrict public disclosure of that data.

In September 1991, NSP filed, at the PSC, gas transportation agreements with RDO Foods Company and the University of North Dakota. At the same time, NSP requested the PSC to issue protective orders to prevent unrestricted public disclosure of the price and volume information in those agreements. As it had routinely done in the past, the PSC issued orders granting trade secret protection and setting forth the procedure to follow if persons wished to view the information or disagreed with the PSC's orders of nondisclosure.

An NSP residential customer, who has since withdrawn from the case, contested the PSC's authority to issue protective orders for this information, and Cass County Electric Cooperative, an energy competitor in part of NSP's service area, intervened

for a like purpose. After a hearing, the hearing officer recommended findings, conclusions, and an order that the price and volume data should be protected as a trade secret.

The PSC agreed with the hearing officer that the price and volume data in the NSP contracts was a trade secret under NDCC Chapter 47–25.1, the Uniform Trade Secrets Act. The PSC concluded, however, that it could not protect the information because it did not fit within any specific exception to North Dakota's constitutional and statutory open-records law. The PSC ruled that the information filed was not "evidence" in a "proceeding," but was "rate information for insertion into NSP's gas tariff." The PSC reasoned:

> The Commission has authority to grant trade secret protection in its formal administrative proceedings, in appropriate circumstances. We may recognize the privileges provided by the North Dakota Rules of Evidence when we are engaged in a formal hearing or proceeding. Some information filed with the Commission may meet the definition of a trade secret under N.D.C.C. Chapter 47–25.1 and thus qualify for protection, in appropriate circumstances, under the Rules of Evidence. However, a finding that information is a trade secret does not automatically provide an exception to our open records requirement. If protection is not available through the Rules of Evidence, information meeting the definition of a trade secret is still information subject to open records.

Using the same rationale, the PSC denied several other applications by NSP for trade secret protection of the price and volume data in similar gas transportation contracts. NSP appealed the PSC's denial of eight applications for trade secret protection to the district court. The district court affirmed, agreeing with the PSC that, although it constituted a trade secret, the price and volume data did not fall within a specific exception to our open-records law. NSP appeals to this court.

■ When an administrative agency decision is appealed to a district court and then to this court, we review the decision of the agency and look to the record compiled before the agency. *Schultz v. North Dakota Dept. of Human Services*, 372 N.W.2d 888, 890 (N.D.1985). Our review of an agency decision is governed by NDCC 28–32–19, which requires us to affirm: (1) if the findings of fact are supported by a preponderance of the evidence; (2) if the conclusions of law are sustained by the findings of fact; (3) if the agency decision is supported by the conclusions of law; and (4) if the decision is in accordance with the law.

■ NSP asserts that our open records law [1] is not violated by giving trade secret protection to the price and volume data contained in its filed contracts because the legislature has specifically excepted that information from the open-records law by enacting NDCC 28–32–06(2), which incorporates the NDREv 507 evidentiary privilege against disclosing trade secrets "at all stages of an administrative proceeding." [2] We reject this argument.

1. Article XI, Section 6 of the North Dakota Constitution declares:

   Unless otherwise provided by law, all records of public or governmental bodies, boards, bureaus, commissions, or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be public records, open and accessible for inspection during reasonable office hours.

   NDCC 44–04–18 reiterates:

   *Access to public records—Penalty.*
   1. Except as otherwise specifically provided by law, all records of public or governmental bodies, boards, bureaus, commissions or

   agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be public records, open and accessible for inspection during reasonable office hours.
   2. Violations of this section shall be punishable as an infraction.

2. NDCC 44–04–18.4 excepts trade secrets from operation of the open-records law under some circumstances:

   *Confidentiality of trade secrets and commercial and financial information.* Trade secrets and commercial and financial information are confidential if of a privileged or confidential nature and obtained by any state agency,

The Uniform Trade Secrets Act broadly defines a trade secret.

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NDCC 47–25.1–01(4). *See also Advanced Business Tel. v. Prof. Data Processing*, 359 N.W.2d 365, 366 (N.D.1984). This definition is broad enough to include the price and volume data in NSP's gas transportation contracts.

Price information and related data may constitute a trade secret under some circumstances, it has been held. *See Agricultural Labor v. Richard A. Glass Co.*, 175 Cal.App.3d 703, 221 Cal.Rptr. 63, 70 (1985); *Carbonic Fire Extinguishers v. Heath*, 190 Ill.App.3d 948, 138 Ill.Dec. 508, 510, 547 N.E.2d 675, 677 (1989). *Compare Aristocrat Window Co. v. Randell*, 56 Ill. App.2d 413, 206 N.E.2d 545, 553 (1965) ["A price list in itself is not necessarily a trade secret"]; *Apollo Stationery Co. v. Pilmar*, 11 Misc.2d 263, 265, 268, 173 N.Y.S.2d 854, 857 (1958) ["Prices are not trade secrets in the sale of ordinary merchandise"].

Here, the PSC found that the "price and volume data contained in NSP's filings derives independent economic value from not being generally known to and not being readily ascertainable by proper means by

providers of alternative fuel," that this data "is kept confidential by NSP," and that, therefore, this data constitutes a trade secret under the Uniform Trade Secrets Act. There is evidence in the record that supports these findings. Given the fact that the PSC had routinely granted trade secret protection for this type of data in the past, we conclude that the PSC reasonably determined that these factual conclusions were proved by the weight of the evidence from the entire record.

■ We agree with the PSC, however, that finding the price and volume data a trade secret for purposes of the Uniform Trade Secrets Act does not automatically except that information from our open-records law. NDCC 44–04–18, which restates and implements Article XI, Section 6 of the North Dakota Constitution, says that all governmental records are open to the public "[e]xcept as otherwise specifically provided by law." Thus, "for an exception to the open-records law to exist under our constitutional and statutory provisions, it must be specific, i.e., the Legislature must directly address the status of the record in question, for a specific exception, by the plain terms of those provisions, may not be implied." *Hovet v. Hebron Public School Dist.*, 419 N.W.2d 189, 191 (N.D.1988). *See also Grand Forks Herald v. Lyons*, 101 N.W.2d 543 (N.D.1960). There is no specific, legislated exception to the open-records law for public utility contracts that are required by law to be publicly filed with a regulatory agency.

The price and volume information here is a public record because it is required by law to be kept, maintained, and publicly

institution, department, or board from any person or organization *under a contract or license agreement entered into by any state agency, institution, department, or board.* The term "trade secrets" includes a computer software program and components of a computer software program which are subject to a copyright or a patent, and any formula, pattern, compilation, program, device, method, technique, or process supplied to any state agency, institution, department, or board which is the subject of efforts by the supplying person or organization to maintain its secrecy and that may derive independent economic value, ac-

tual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons or organizations that might obtain economic value from its disclosure or use. [Emphasis added]. NSP, conceding that it has not entered into a contract or license agreement with the PSC, does not rely on this statute as the basis for excepting the price and volume data from the open-records law. If our decision today adversely affects vital business interests of this utility, utilities are free to seek an expansion of this exception from the open-records law by the Legislature.

filed. *See Forum Pub. Co. v. City of Fargo,* 391 N.W.2d 169, 171 (N.D.1986); *City of Grand Forks v. Grand Forks Herald,* 307 N.W.2d 572, 578 (N.D.1981). The PSC is required to supervise the rates of all public utilities and is empowered to "originate, establish, modify, adjust, promulgate, and enforce tariffs, rates, joint rates, and charges of all public utilities." NDCC 49–02–03. Furthermore, in performing its duties, under NDCC 49–02–02(3), and by NDAC 69–09–01–26,[3] the PSC is authorized to require, and does require, public utilities to file their rates and other pertinent information "with the commission."

NSP does not dispute that the information in question here is part of its tariff. A tariff is commonly defined as a "public document setting forth services of [a public utility] being offered, rates and charges with respect to services and governing rules, regulations and practices relating to those services." *Black's Law Dictionary* at p. 1457 (6th ed. 1990) [citing *Intern. Tel. & Tel. Corp. v. United Tel. Co. of Florida,* 433 F.Supp. 352, 357 n. 4 (M.D.Fla.1975), *aff'd* 550 F.2d 287 (5th Cir.1977)]. *See also Southwestern Bell Tel. v. State Corp. Com'n,* 233 Kan. 375, 664 P.2d 798, 800 (1983) ["Tariffs are those terms and conditions which govern the relationship between the utility and its customers"]. The information for NSP's tariff, statutorily required to be filed with the PSC, is therefore a public record and is subject to our open-records law, absent a specific exception.

NSP asserts that the price and volume information contained in its tariff is specifically excepted from disclosure by NDCC 28–32–06(2):

Upon proper objection, evidence that is irrelevant, immaterial, unduly repetitious, or excludable on constitutional or statutory grounds, or on the basis of evidentiary privilege recognized in the courts of this state, may be excluded. In the absence of proper objection, the agency or any person conducting an investigation or proceeding for it may exclude objectionable evidence. *The North Dakota Rules of Evidence in regard to privileges apply at all stages of an administrative proceeding under this chapter.*

[Emphasis added]. Because NDREv 507 establishes a privilege that may be claimed by a holder of a trade secret, this statutory provision, according to NSP, constitutes a specific exception to our open-records law. We disagree for two reasons.

When read in its entirety, NDCC 28–32–06(2) primarily deals with evidence offered at a hearing. We do not believe that the language incorporating evidentiary privileges to "all stages of an administrative proceeding" applies to the filing of information for inclusion in a tariff. The filing of a tariff does not initiate an administrative "proceeding." As acknowledged by NSP, the filing of a rate or tariff does not make or change rates; rather, the primary purpose of filing these individually negotiated contracts is to notify the PSC of the rates agreed to by NSP with its various customers and to allow the PSC to review those rates for irregularities. *See generally United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 340–344, 76 S.Ct. 373, 379–380, 100 L.Ed. 373 (1956). The initial rate-making and rate-changing powers remain with NSP and its large volume customers subject to review by the PSC.

---

**3.** NDCC 49–02–02(3) says:

*Powers of public service commission with reference to public utilities.* The commission shall have power to:

\* \* \* \* \* \*

3. Require copies of reports, rates, classifications, schedules, and time-tables in effect and used by such utilities or other persons and all other information desired by the commission relating to such investigations and requirements to be filed with the commission.

NDAC 69–09–01–26 directs:

Filing of rates.

1. Each utility shall file with the commission its scheduled rates, rules, regulations, and practices in accordance with the statutory requirements.

2. Each rate filing shall stipulate the classification of service and application thereto, date effective, and the particular rate to be superseded. The filing shall be accompanied by a statement showing the reasons for making the filing and the estimated amount of annual revenue affected, based upon the previous year's business.

*Id.* We conclude that these tariff filings are not "proceedings" within the meaning of NDCC Chapter 28–32, the Administrative Agencies Practice Act. *Id.*

Moreover, even if the filing became an "administrative proceeding" when NSP simultaneously sought trade secret protection so that NDREv 507 applied in this case, the evidence rule would not mandate nondisclosure of NSP's tariff information. NDREv 507 says:

A person has a privilege, which may be claimed by him or his agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by him, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. If disclosure is directed, the court shall take such protective measures as the interest of the holder of the privilege and of the parties and the interests of justice require.

The Explanatory Note to Rule 507 stresses that the trade secret privilege is "a limited privilege" and that "[t]he instances in which the invocation of this privilege is justified are few." Thus, Rule 507 does not grant an absolute right to refuse to disclose a trade secret; rather, it provides only a conditional privilege of nondisclosure if it would not work an injustice. *See Public Service Com'n v. Eighth Jud.D.Ct.,* 107 Nev. 680, 818 P.2d 396, 399 (1991). The PSC could have reasonably concluded under Rule 507 that, even though NSP's tariff information is a trade secret, NSP is not entitled to assert the privilege because to do so would work an injustice to other ratepayers and the public. *Id.* Construed together, NDREv 507 and NDCC 28–32–06(2) do not create a specific exception to the open-records law for the tariff information that NSP seeks to protect from disclosure.

■ NSP also relies on our cases that hold if a statute is susceptible of two constructions, one that would render it of doubtful constitutionality and one that would not, the latter must be adopted. *See,* for example, *In the Matter of the Adoption of K.A.S.,* 499 N.W.2d 558, 566 (N.D.1993). NSP argues that we must interpret NDCC 28–32–06(2) and NDREv 507 to protect against public disclosure of the price and volume data in these contracts because NSP would otherwise be unconstitutionally deprived of a valuable property right. Under the circumstances, we disagree.

In *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the United States Supreme Court held that, to the extent that Monsanto, an applicant for registration of pesticides, had a confidential economic interest in its health, safety, and environmental data that was cognizable as a property right in a trade secret under state law, that property right was protected by the Taking Clause of the Fifth Amendment to the United States Constitution. In that case, Monsanto challenged the use by the Environmental Protection Agency [EPA], and the public disclosure, of data that Monsanto filed with EPA in accordance with the requirements of the Federal Insecticide, Fungicide, and Rodenticide Act [FIFRA] to register its pesticides.

Recognizing that property interests are not created by the Constitution, but " ' "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law," ' " the Court determined that because intangible trade secret rights were protected by Missouri law, Monsanto had a property interest in its trade secrets protected by the Fifth Amendment. *Monsanto,* 467 U.S. at 1001, 104 S.Ct. at 2872 [quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980), quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)]. In this case, the PSC does not dispute that, as Monsanto had a property interest in its trade secrets, NSP has a protectible trade secret by virtue of North Dakota's adoption of NDCC Chapter 47–25.1, the Uniform Trade Secrets Act.

The Supreme Court next considered whether a "taking" of property within the meaning of the Fifth Amendment would occur if the EPA publicly disclosed the data

submitted by Monsanto. Acknowledging that it had generally been unable to develop any set formula for determining whether a governmental action has gone beyond "regulation" and effects a "taking," the Court listed three factors for consideration: " 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.' " *Monsanto*, 467 U.S. at 1005, 104 S.Ct. at 2874 [quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980) ]. The Court found the last of these three factors, a reasonable investment-backed expectation, was dispositive of the "taking" question.

Stating that "[a] 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need,' " the Court distinguished between data submitted during three different time periods, each framed by different amendments to FIFRA. *Id.* [quoting *Webb's Fabulous Pharmacies*, 449 U.S. at 161, 101 S.Ct. at 451]. For FIFRA amendments effective in 1978, which established the data-disclosure mechanisms under attack, the Court held that their enactment put Monsanto "on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration." *Monsanto*, 467 U.S. at 1006, 104 S.Ct. at 2874. Consequently, the Court concluded that, with respect to data filed after 1978, Monsanto "could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself." *Id.*

However, during the time earlier amendments were in effect between 1972 and 1978, the statute "had explicitly guaranteed to Monsanto ... an extensive measure of confidentiality and exclusive use. This explicit governmental guarantee formed the basis of a reasonable investment-backed expectation." *Monsanto*, 467 U.S. at 1011, 104 S.Ct. at 2877. The Court determined, 467 U.S. at 1012, 104 S.Ct. at 2877, that EPA's disclosure of protected data contrary to the guarantee for that time period could constitute a taking.

Before the 1972 amendments, the FIFRA statute "was silent" on the subject and did not explicitly give EPA any authority to disclose the data. *Monsanto*, 467 U.S. at 1008, 104 S.Ct. at 2875. However, a general statute, the Trade Secrets Act, 18 U.S.C. 1905, provided for criminal penalties against federal employees who disclosed trade secrets in a manner not authorized by law. Notwithstanding these circumstances, the Court held, 467 U.S. at 1008–1009, 104 S.Ct. at 2876, that Monsanto "had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA" in the absence of "an express promise," and the Trade Secrets Act did not constitute such a promise.

In response to the argument that FIFRA's requirement that a pesticide registrant give up its property interest in the data amounted to placing an unconstitutional condition on the right to a valuable government benefit, the Court reasoned:

But Monsanto has not challenged the ability of the Federal Government to regulate the marketing and use of pesticides. Nor could Monsanto successfully make such a challenge, for such restrictions are the burdens we all must bear in exchange for " 'the advantage of living and doing business in a civilized community.' " *Andrus v. Allard*, 444 U.S. 51, 67, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. [393] at 422, 43 S.Ct. [158] at 162 [67 L.Ed. 322 (1922) ] (Brandeis, J., dissenting); see *Day–Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952). This is particularly true in an area, such as pesticide sale and use, that has long been the source of public concern and the subject of government regulation. That Monsanto is willing to bear this burden in exchange for the ability to market pesticides in this country is evidenced by the fact that it has continued to expand its research and development and to submit data to EPA despite the enactment of the 1978 amendments to FIFRA. 564 F.Supp. at 561.

Thus, as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking. See *Corn Products Refining Co. v. Eddy*, 249 U.S. 427, 431–432, 39 S.Ct. 325, 327, 63 L.Ed. 689 (1919) ("The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the State, in the exercise of its police power and in promotion of fair dealing, to require that the nature of the product be fairly set forth"); see also *Westinghouse Electric Corp. v. United States Nuclear Regulatory Comm'n*, 555 F.2d 82, 95 (CA3 1977).

*Monsanto*, 467 U.S. at 1007–1008, 104 S.Ct. at 2875 [footnote omitted]. Paraphrasing this analysis, we conclude that, as long as NSP is aware of the open-records law under which its contracts are filed with the PSC, and the filing requirement is rationally related to the legitimate state purpose of public utility regulation, "a voluntary submission of data by [a public utility] in exchange for the economic advantages of [regulation] can hardly be called a taking."

The purpose of the open-records law is "to provide the public with the right and the means of informing itself of the conduct of the business in which the public has an interest, in order that the citizen and taxpayer might examine public records ... for the purpose of bringing to the attention of the public irregularities in the handling of public matters." *Lyons*, 101 N.W.2d at 546. A state's interest in public utility regulation "in furtherance of the public good is substantial and ranks among 'the most important functions traditionally associated with the police power of the States.'" *Application of Otter Tail Power Co.*, 451 N.W.2d 95, 107 (N.D.1990) [quoting *Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983)]. In the phrasing of *Monsanto*, 467 U.S. at 1007, 104 S.Ct. at 2875, public utilities, like pesticide manufacturers, have "long been the source of public concern and the subject of government regulation."

Our open-records law mandates public availability of public records for inspection. This constitutional mandate was in effect long before these disputed tariff filings occurred. The open-records law is clear and unambiguous. NSP was aware of our open-records law when it filed this information.

The PSC's prior unchallenged practice of granting trade secret protection to this type of information did not constitute a promise that the information would never be disclosed. It is fundamental that an agency of state government or its officials generally cannot bind the state by an act that violates the law. See *Tulsa Tribune Co. v. Fulton*, 696 P.2d 497, 500 (Okl.1984). *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 134 (N.D.1987), said it well: "A[n] ... authority may modify past practices to the disadvantage of a [citizen] if it is determined that the former practice was incorrect, and such action may take place in the absence of an authoritative court decision and even though it may result in the subjection of identical transactions occurring at different times to different ... treatment."

The requirement that information in a public utility's tariff be available for public inspection is, we believe, rationally related to the legitimate governmental interest of policing irregularities in the handling of public matters affecting the rates paid by citizens for an essential commodity in this state. Under these circumstances, we conclude that NSP could have no reasonable, investment-backed expectation that the price and volume data in its tariff would not be available for public inspection, and therefore, no governmental "taking" would be implicated by requiring disclosure. Accordingly, making this information available for public inspection does not create a constitutional infirmity, and NDCC 28–32–06(2) and NDREv 507 need not be interpreted to bar disclosure of the information.

We nevertheless recognize that disclosure of other information required to be

**248**

filed with the PSC by a public utility might, under other circumstances, constitute a "taking" under *Monsanto*. We are aware of cases that have provided trade secret protection for information furnished to a regulatory agency by a public utility. *See Burlington Northern v. Omaha Public Power Dist.*, 888 F.2d 1228 (8th Cir.1989); *Southwestern Bell Telephone Company v. State Corp. Com'n*, 6 Kan.App.2d 444, 629 P.2d 1174 (1981); *Mountain States Tel. & Tel. Co. v. Dept. of Pub. Serv. Reg.*, 194 Mont. 277, 634 P.2d 181 (1981); *Application of Northwestern Bell Telephone*, 223 Neb. 415, 390 N.W.2d 495 (1986); *New York Telephone v. Public Service Comm'n, Etc.*, 56 N.Y.2d 213, 451 N.Y.S.2d 679, 436 N.E.2d 1281 (1982); and Annot., *What Constitutes "Trade Secrets" Exempt from Disclosure under State Freedom of Information Act*, 27 A.L.R.4th 773 (1984), and cases collected there. However, these decisions are distinguishable because they either involve explicit statutory exceptions from open records acts for trade secrets in general, or involve rate cases where the information was offered as evidence in support of the publicly filed rates. We find none of these cases persuasive in applying our open-records law.

From this record, we conclude that the PSC's findings are supported by a preponderance of the evidence, its conclusions of law are sustained by the findings of fact, its decision is supported by the conclusions of law, and its decision is in accordance with the law. The PSC did not err in denying NSP's applications for trade-secret protection in this case.

Accordingly, the judgment of the district court upholding the PSC's decision is affirmed.

NEUMANN, J., VERNON R. PEDERSON, Surrogate Judge and ALLAN SCHMALENBERGER, District Judge, concur.

ALLAN SCHMALENBERGER, D.J., WALLACE D. BERNING, D.J., and VERNON R. PEDERSON, S.J., sitting in place of LEVINE, J., VANDE WALLE, C.J., and SANDSTROM, J., disqualified.

WALLACE D. BERNING, District Judge, Sitting by Designation.

I dissent. The decision of the majority is disappointing and, more importantly, fundamentally erroneous. The Administrative Agencies Practice Act at 28–32–06(2) incorporates the evidentiary rules of privilege for "all stages of an administrative proceeding" and protects "trade secrets" from being disclosed under the circumstances enumerated in NDREv 507.

I strongly disagree that a tariff filing is not a "stage of an administrative proceeding" as contemplated by 28–32–06(2), NDCC. Although the phrase "administrative proceeding" is not defined in NDCC 28–32, a common, usual, and, indeed, *ordinary* meaning of the word "proceeding" is a "legal action" or "taking of legal action." *Webster's New World Dictionary*, Second College Edition (1980). Like definitions appear in all reputable dictionaries. In *Black's Law Dictionary* the term "administrative proceeding" is not defined. However, the phrase "administrative procedure" is defined as: "Methods and processes before agencies as distinguished from judicial procedure which applies to courts." The applicable definition of "proceeding" is defined as: "An act which is done by the authority or direction of the court, *agency*, or tribunal, express or implied; an act necessary to be done in order to obtain a given end ..." (Emphasis added).

Additionally, statutes must be construed as a whole to give meaning, if possible, to all clauses and phrases in the act. *E.g., County of Stutsman v. State Historical Society*, 371 N.W.2d 321 (N.D.1985). A perusal of NDCC 28–32 indicates that it makes several references to different kinds of "proceedings": *i.e.*, contested cases [28–32–01(4), 28–32–05(1) and (2), 28–32–12.1, 28–32–12.2]; rulemaking authority [28–32–02 and 28–32–19.1]; uncontested cases [28–32–05(3) ]; informal disposition of "contested case, noncontested case, or other administrative proceeding" [28–32–05.1]; formal hearing [28–32–07]; investigatory hearings [28–32–08]; hearing officers for an administrative proceeding [28–32–08.1]; interven-

tion in an administrative proceeding [28–32–08.2]; subpoena powers for hearing or other proceeding [28–32–09]; administration of oaths in an administrative proceeding [28–32–11]; agency compilation of record at "any contested case proceeding, noncontested case proceeding, or other administrative proceeding" [28–32–12]; findings of fact, conclusions of law and order in "a proceeding before an administrative agency" [28–32–13]; appeal by "any party to any proceeding heard by an administrative agency" [28–32–15]; and agency to certify record on appeal of "contested case proceeding, noncontested case proceeding, or other administrative proceeding" [28–32–17].

When read together, those statutory provisions indicate that the Legislature intended the term "administrative proceeding" to encompass many different procedural postures for matters before an administrative agency. In the context of NSP's rate filings and the information in this case, the PSC is required to supervise the rates of all public utilities and may "originate, establish, modify, adjust, promulgate, and enforce tariffs, rates, joint rates, and charges of all public utilities." NDCC 49–02–03. The PSC has the power to review NSP's rates, and when NSP files a rate for interruptible natural gas service, the rate is accepted unless the PSC rejects the filing within twenty days. Neither Section 28–32–06(2), nor any other provision in Chapter 28–32 excludes rate filings from "administrative proceedings." The PSC actions with regard to NSP's rate filing fits comfortably under the ordinary meaning of "all stages of an administrative proceeding." Moreover, even if a rate filing, by itself, does not qualify as a "stage of an administrative proceeding," NSP's actions in filing an application for a protective order for its information would seemingly qualify as a "stage of an administrative proceeding." If not earlier, at least by then, the PSC would have given NSP's application a docket number and title. NDAC 69–02–01–04.

To add nails to the coffin the majority concludes that even if the rate filings are deemed "a stage of an administrative pro-

ceeding," there is still no requirement for protection of trade secrets under NDREv 507. However, the only permissible and proper interpretation of that rule and the accompanying explanatory note is that the subject agency or tribunal *must* make a preliminary determination to ascertain if sustaining the privilege would "... tend to conceal fraud or otherwise work injustice." The record shows no such determination by the PSC in this case. Rather, the PSC decision indicates that it categorically determined that "we cannot protect the information." This Court has often reversed and remanded cases when a trial court or an administrative agency has failed to make necessary determinations for such omissions. *Schempp–Cook v. Cook*, 455 N.W.2d 216 (1990); *Evans v. Backes*, 437 N.W.2d 848 (1989); *Hystad v. Industrial Commission*, 389 N.W.2d 590 (1986).

For the above reasons, I would reverse the PSC decision and remand for a determination under the guidelines of NDREv 507.