ADAMS COUNTY RECORD, Ashley Tribune, Walsh County Record, Walsh County Press, and Jennifer Ring, Plaintiffs and Appellants,

v.

GREATER NORTH DAKOTA ASSOCIATION, North Dakota Chamber of Commerce, (GNDA), Defendants and Appellees.

Civ. No. 940084.

Supreme Court of North Dakota.

March 16, 1995.

Thomas A. Dickson, P.C., Bismarck, for plaintiffs and appellants; argued by Sharon A. Gallagher.

Dorsey & Whitney, Fargo, argued by Nicholas J. Spaeth, and Kelsch, Kelsch, Ruff & Austin, Mandan, for defendants and appellees; appearances by Thomas D. Kelsch, and Dale Anderson, President of Greater North Dakota Ass'n.

Thomas M. Disselhorst, Bismarck, Common Cause of North Dakota, amicus curiae, submitted on brief.

SANDSTROM, Justice.

This appeal questions if North Dakota's open records law, Art. XI, § 6, N.D. Const., and N.D.C.C. § 44–04–18, applies to the Greater North Dakota Association (GNDA), a private, nonprofit corporation. The trial court granted summary judgment denying an application for mandamus, because GNDA was not a public or governmental organization.

We reverse and remand for trial, holding there are genuine issues of material fact as to whether GNDA is an organization supported in part by public funds, and thus subject to the open records law.

I

The Greater North Dakota Association is a nonprofit corporation organized under North Dakota law in 1925. GNDA has turned its interests to promoting a favorable business climate in the state by engaging in lobbying efforts. A focusing of its activities is evi-

denced by GNDA's new mission statement: "GNDA is the voice of business and the principal advocate for positive change in North Dakota." In furtherance of a favorable business climate, GNDA, with others, formed the North Dakota Coalition for Liability Reform. The coalition drafted and presented legislation on liability and tort reform and lobbied for its passage.

Among GNDA's approximately 1000 members are ten state government agencies which have purchased thirty memberships. GNDA has solicited government agency memberships. According to GNDA, in return for membership dues each member is entitled to voting privileges, *GNDA News, North Dakota Horizons* magazine, Business Challenge Briefs, the *Legislative Report, Wholesale and Manufacturer's Update, Legislative Link,* Legislative Position Statements, a membership plaque, and membership surveys.

GNDA publishes the magazine, *North Dakota Horizons.* According to agreements between GNDA and the Department of Tourism (and its predecessors), state funds are provided to GNDA to aid in publishing *Horizons.* The agreements state *Horizons* is not yet financially self-sufficient to ensure continued publication. In the most recent agreement for the 1993–95 biennium, $60,000 was appropriated by the Legislative Assembly to the Tourism Department. The title of this appropriation is "GRANTS." The money is distributed by Tourism in quarterly allotments of $7,500 for each issue of *Horizons.*

During the 1993 legislative session, in a hearing before the House Judiciary Committee, GNDA's president was questioned regarding its role in tort reform activities. Representative Jennifer Ring then asked its president if GNDA received a $60,000 appropriation from the state. GNDA admitted it received these funds. Based on this information, Ring attempted to obtain access to GNDA's records under our open records law, but was denied. In response to Ring's request, the GNDA president wrote to the Chairman of the Judiciary Committee, acknowledging state government "supports GNDA programs."

An Attorney General's Opinion, requested by Ring, held all GNDA's records are open to the public. GNDA disagreed with the opinion and refused access. Ring, along with the *Adams County Record, Ashley Tribune, Walsh County Record,* and the *Walsh County Press* (collectively "Adams County Record"), then sought to compel GNDA to turn over its records by writ of mandamus. The trial court issued an alternative writ requiring GNDA to appear and show cause if it failed to open the records, and enjoined GNDA from destroying or transferring its records. After demanding and securing a change of judge, GNDA secured an ex parte court order blocking pre-trial discovery by the Adams County Record. The Adams County Record sought to lift the discovery protective order. GNDA moved for summary judgment. At the conclusion of the hearing set for these and other motions, the trial court vacated the alternative writ of mandamus and granted summary judgment denying the Adams County Record its requested relief. The trial court ruled GNDA was not supported by public funds, a requirement of the open records law, and its records should not be subject to inspection.

We have jurisdiction under Art. VI, § 6, N.D. Const., and N.D.C.C. § 28–27–02(2) (final order affecting a substantial right made in a special proceeding). Notice of appeal was timely filed under Rule 4(a), N.D.R.App.P.

## II

### A

North Dakota has two provisions dealing with open records. The first, enacted in 1957, provides in part:

"Except as otherwise specifically provided by law, all records of public or governmental bodies, boards, bureaus, commissions or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, are public records, open and accessible for inspection during reasonable office hours."

N.D.C.C. § 44–04–18(1).

To further ensure the accessibility of public records, the Forty–Fifth Legislative As-

sembly proposed a constitutional measure that was overwhelmingly approved by the people of North Dakota. The amendment provides:

"Unless otherwise provided by law, all records of public or governmental bodies, boards, bureaus, commissions, or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be public records, open and accessible for inspection during reasonable office hours."

Art. XI, § 6, N.D. Const.

▮▮▮ The interpretation of a statute is a question of law fully reviewable by this Court. *Christianson v. City of Bismarck,* 476 N.W.2d 688, 690 (N.D.1991). When interpreting a statute, our primary purpose is to ascertain the intent of the legislature. *See Burlington Northern v. State,* 500 N.W.2d 615, 617 (N.D.1993). Legislative intent must first be sought from the language of the statute. *Burlington Northern.* When the statutory language is clear and unambiguous, it cannot be disregarded under the pretext of pursuing the legislative intent as intent is presumed to be clear from the face of the statute. *Burlington Northern;* N.D.C.C. § 1–02–05.

When construing Art. XI, § 6, N.D. Const., and N.D.C.C. § 44–04–18, this Court in the past has relied heavily upon the plain language of the provision and the statute. *See City of Grand Forks v. Grand Forks Herald,* 307 N.W.2d 572, 577 (N.D.1981) ("We believe that the term 'records' as used in § 44–04–18, N.D.C.C., and Article XI, § 6 of the North Dakota Constitution is unambiguous."); *Forum Publishing Co. v. City of Fargo,* 391 N.W.2d 169, 172 (N.D.1986) ("in the absence of specific statutory exception and given the broad and expansive reading of section 44–04–18, N.D.C.C., . . . we believe that the job applications in this case are part of the personnel records of the City and are subject to the open-record law."); *Hovet v. Hebron Pub. School Dist.,* 419 N.W.2d 189, 191 (N.D.1988) ("Thus, for an exception to the open-records law to exist under our constitutional and statutory provisions, it must be specific, i.e., the Legislature must directly address the status of the record in question, for a specific exception, by the plain terms of those provisions, may not be implied."), *Northern States Power Co. v. North Dakota Pub. Serv. Comm'n,* 502 N.W.2d 240, 247 (N.D.1993) ("The open-records law is clear and unambiguous.").

Relying upon the clear and unambiguous language of § 44–04–18 and Art. XI, § 6, this Court early on delineated the legislative purpose for its enactment:

"What the Legislature was attempting to accomplish was to provide the public with the right and the means of informing itself of the conduct of the business in which the public has an interest, in order that the citizen and taxpayer might examine public records to determine whether public money is being properly spent, or for the purpose of bringing to the attention of the public irregularities in the handling of public matters."

*Grand Forks Herald v. Lyons,* 101 N.W.2d 543, 546 (N.D.1960).

B

▮▮▮ The plain language of the open records law states all records of the entities listed are public records, open for inspection, "[e]xcept as otherwise specifically provided by law, . . . ." N.D.C.C. § 44–04–18; *see also* Art. XI, § 6, N.D. Const. ("[u]nless otherwise provided by law, . . . ."). This language recognizes the Legislative Assembly has the authority to make certain records confidential. *See Grand Forks Herald* at 580 (VandeWalle, J., concurring). For an exception to exist under the open records law, "it must be specific, i.e., the Legislature must directly address the status of the record in question, for a specific exception, by the plain terms of those provisions, may not be implied." *Hovet* at 191.

GNDA does not argue its records fall within a specific statutory exception. The trial court, in its amended order, did not rely upon a specific statutory exception. The rationale for denying the Adams County Record access was GNDA did not fall under the definition of an entity subject to the open records law. The sole issue thus becomes whether GNDA

is an organization listed in N.D.C.C. § 44–04–18, or Art. XI, § 6, N.D. Const.

C

This Court has recognized the manner in which GNDA wishes to avoid being subjected to the open records law. In *Grand Forks Herald v. Lyons,* 101 N.W.2d 543 (N.D.1960), this Court held the open records law does not apply to county courts.

> "[N]owhere do we find any indication that the Legislature intended 'agencies of the state' to include the courts or to include anything except those departments, agencies, and bureaus of the State which it clearly included, such as 'governmental bodies, boards, bureaus, commissions, . . . or political subdivisions.' The Legislature no doubt intended to make information available to the public relative to the spending of public monies and the handling of public business. And that is all that it intended."

*Lyons* at 546.

In this case, Adams County Record argues GNDA is an organization "supported in whole or in part by public funds." N.D.C.C. § 44–04–18, Art. XI, § 6, N.D. Const. The Adams County Record points to state funds which GNDA has received in the form of membership dues for state agencies and a grant of $60,000 provided by the Tourism Department to aid GNDA in publishing *North Dakota Horizons,* a magazine founded by GNDA. The trial court held, in part, the mere contracting by a public agency for services with a private company does not bring the company within the purview of the open records law. Once public funds are paid in exchange for goods and services, the court held, they cease to be public funds. The Adams County Record, in its petition for mandamus and in arguments and its brief to this Court, claimed the inspection of GNDA's records was necessary to determine whether public money was being provided to GNDA while at the same time GNDA was lobbying the state's legislature, raising potential conflicts. The Adams County Record also argues the records should be opened to determine whether GNDA's allegiance lies with the state, or with out-of-state corporate interests such as the tobacco industry, who may be underwriting GNDA's lobbying efforts.

■ The open records law does not define "public funds." However, in chapter 21–04, *Depositories of Public Funds,* public funds are defined as:

> "[A]ll funds derived from taxation, fees, penalties, sale of bonds, or from any other source, which belong to and are the property of a public corporation or of the state, and all sinking funds of such public corporation or of the state, and all funds from whatever source derived and for whatever purpose to be expended of which a public corporation or the state have legal custody. They include the funds of which any board, bureau, commission, or individual, created or authorized by law, is authorized to have control as the legal custodian for any purpose whatsoever whether such funds were derived from general or special taxation or the assessment of persons or corporations for a specific purpose."

N.D.C.C. § 21–04–01(5). A virtually identical definition appears in N.D.C.C. § 23–17.2–02(19). When the meaning of a word or phrase is defined in a section of our Code, that definition applies to any use of the word or phrase in other sections of the Code, except when a contrary intent plainly appears. N.D.C.C. § 1–01–09. This definition encompasses the funds transferred from the state agencies to GNDA for dues and *Horizons* magazine.

■ The open records law requires public funds to be used as "support" for the organization. The trial court correctly noted not every transfer of public funds to a private entity is support. If it was, every corporation, contractor, and association of the state would be subject to the open records law each time the government paid for services or goods or awarded a contract. This is not the intent of the open records law. In other states with open records laws containing a provision applying to organizations "supported in whole or part by public funds" a distinction appears. The Supreme Court of Indiana in *Indianapolis Convention and Visitors Ass'n v. Indianapolis Newspapers, Inc.,*

577 N.E.2d 208 (Ind.1991), faced the application of its open records law to a private association receiving proceeds from a hotel-motel tax. The association, (ICVA), asserted it was not subject to the Act because it was not "supported" by public funds, which meant only to "subsidize" or to "keep in existence." *ICVA* at 212. The court agreed with the association's interpretation.

"We agree with ICVA that a private entity is not maintained or supported by public monies within the meaning of the [open records law] merely because public monies make up a certain percentage of its revenue. *If the relationship is, in fact, a fee-for-services (or goods) agreement then, clearly, an entity is not maintained or supported by public funds.* Otherwise, any entity who performed any service or provided any good for any governmental entity would find its business records available for public inspection under the Public Records Act. We do not perceive this to be the legislature's intent in passing the Public Records Act."

*ICVA* at 212–13 (emphasis added).

A similar conclusion was reached in *Weston v. Carolina Research & Development Foundation*, 303 S.C. 398, 401 S.E.2d 161 (1991). The law also applied to all organizations supported in whole or part by public funds, which the court defined:

"As the trial judge correctly noted, this decision does not mean that the (open records law) would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms length basis. In that situation, there is an exchange of money for identifiable goods or services and access to the public body's records would show how the money was spent. However, when a block of public funds is diverted *en masse* from a public body to a related organization, or when the related organization undertakes the management of the expenditure of public funds, the only way that the public can determine with specificity how those funds were spent is through access to the records and affairs

of the organization receiving and spending the funds."

*Weston,* 401 S.E.2d at 165.

The conclusion that support means something other than an exchange of services or goods for money, a *quid pro quo,* is also found in decisions of this Court. Art. X, § 18, N.D. Const. (formerly § 185), provides:

"The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article XX of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

When construing this provision, this Court has distinguished between a "donation" and an exchange for value. In *Northwestern Bell Telephone Co. v. Wentz,* 103 N.W.2d 245 (N.D.1960), the reimbursement of utility companies for relocation in connection with an interstate highway project was held not to violate § 185 (§ 18) and did not constitute a "donation."

"The legislature created an obligation upon the fund to reimburse utilities for their non-betterment cost in relocating facilities along and across the interstate system. We need not determine whether this constitutes a donation, because if it is, it is an onerous one. It is made subject to the charge that the utility remove, relocate or change its facilities to accommodate the construction of the highway and designated as a part of the cost thereof. It is an obligation incurred in the construction of a public highway."

*Wentz* at 256. An "onerous donation" was "one burdened with some charge imposed upon the donee and which charge has a *direct relation* to the internal improvement in question." *Wentz* at 254 (emphasis added).

Upon reviewing decisions of this Court and those of other jurisdictions, we conclude the term support, as used in the open records law, means something other than an ex-

change of money for identifiable and specific goods and services. When there is a bargained-for exchange of value, a *quid pro quo*, the entity is not supported by public funds. As such, those agencies or organizations carrying out business with the state or employed by the state are not subjected to the open records law.

▪ The policy underlying our open records law is to allow taxpayers to see how state funds are used. An organization contracting with the state with a valid *quid pro quo* has exchanged specific and identifiable goods or services with the state and records of those goods or services would be in the hands of the state agency. The public has access to the state's records under the open records law. When an organization is supported by public funds there is no exchange of goods or services for funds. The only way a taxpayer can see how state funds were used is to access the private organization's records to see how that organization used the money.[1]

## D

▪ The trial court, in denying the Adams County Record's petition for writ of mandamus, held there were no material facts in dispute and the claim should be decided as a matter of law. A writ of mandamus will not lie unless the petitioner's legal right to the performance of the particular act sought to be compelled is clear and complete. *Lee v. Walstad*, 368 N.W.2d 542, 545 (N.D.1985). We will reverse the trial court's denial of the writ if, as a matter of law, the writ should issue or the trial court abused its discretion. *Walstad*. "The fact that the court will be

forced to construe or interpret a statute or examine the facts to which a statute applies does not necessarily preclude the remedy of mandamus." *Fargo Educ. Ass'n v. Paulsen*, 239 N.W.2d 842, 845 (N.D.1976). Statutes defining public duties often lend themselves to different interpretations and require judicial construction to enunciate specifically the duties expected before enforcement. *Paulsen*. A trial court abuses its discretion when it misinterprets or misapplies the law. *Christianson* at 689.

## E

The Adams County Record's first basis for claiming GNDA is subject to the open records law is by receipt of public funds as membership dues. Approximately thirty memberships were purchased by ten different state agencies or divisions. GNDA members are entitled to voting privileges, and receive the *GNDA News*, a subscription to *Horizons, Legislative Report, Legislative Link,* Legislative Position Statements, and *Wholesale and Manufacturer's Update*.

▪ Where membership dues result in "a *quid pro quo*, in sufficiently identifiable quantities" there is not "support for the purposes of the open records law." *Kneeland v. NCAA*, 850 F.2d 224, 230 (5th Cir.1988), *cert. denied*, 488 U.S. 1042, 109 S.Ct. 868, 102 L.Ed.2d 991 (1989) (holding public funds paid to the National Collegiate Athletic Association for membership dues not unrestricted grants for support because NCAA Bylaws restricted use of dues for the costs of publications, conventions, establishing playing rules, and compiling statistics). Those dues

---

1. Art. X, § 18, N.D. Const., does not prohibit the state from making donations to private enterprise. It clearly can. *See Gripentrog v. City of Wahpeton*, 126 N.W.2d 230 (N.D.1964). The constitutional provision merely provides an additional basis for allowing the public access to records of funds spent for a "public purpose." Art. X, § 18, N.D. Const., gives the state the right to make loans, extend credit, or make donations in connection with any industry, enterprise, or business. That constitutional provision incorporates restrictions of the due process clause of the federal constitution. *See Gripentrog*. Any loan or donation must be for a public purpose. *Gripentrog* at 237. A "public purpose" is defined as "the promotion of the public health, safety, mor-

als, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division." *Gripentrog*. If the funds given to GNDA constitute "support" or a "donation" we must presume the Legislative Assembly and relevant departments acted constitutionally and donated these funds for a "public purpose." *See Herr v. Rudolf*, 25 N.W.2d 916, 920, 75 N.D. 91, 99 (1947). Thus, the policy behind the open records law, "to make information available to the public relative to the spending of the public monies and the handling of public business," *Lyons* at 546, would be furthered by allowing the public to view records relating to public funds spent for a public purpose.

which are for the general support of the organization constitute "support" for purposes of the open records law. *Kneeland.* The documents in the record reflect that GNDA is not restricted to using dues for such specific and identifiable goods and services. GNDA's articles of incorporation specify no goods or services in exchange for membership dues. GNDA's membership invoice in the record reflects only $12.00 (out of $400.00) goes for specified publications. The trial court blocked the Adams County Record's attempt to discover specific information about GNDA's organization and structure. The trial court abused its discretion in denying discovery of this potentially relevant information. We conclude the evidence and the inferences favorable to the Adams County Record were sufficient to defeat summary judgment based on membership "support."

### F

GNDA also receives public funds in the form of a grant originally established to aid in publishing *Horizons* magazine. An appropriation of $60,000 was provided in 1993 to the Tourism Department for this grant. H.B. 1014, S.L.1993, ch. 14, § 1. The Tourism Department, in turn, has entered into a written agreement with GNDA to provide $7,500 per issue, or a total of $60,000 for the 1993–95 biennium, to help publish *Horizons* magazine. The agreement provides in part:

"WHEREAS, that in the interest of promoting the State of North Dakota and extolling its natural, cultural, and historical amenities, the Greater North Dakota Association has undertaken to publish *North Dakota Horizons* magazine; and

"WHEREAS, the publication of *North Dakota Horizons* is not financially self-sufficient to the point where the continued publication of the magazine can be insured [sic]; and

"WHEREAS, the continued publication of *North Dakota Horizons* is in the public interest; to insure [sic] adequate dissemination of information on natural, cultural, and historical amenities which are appealing to travelers, vacationists, and of all citizens of this great state and nation; and

"WHEREAS, both parties recognize the mutual benefits gained by the continued publication of *North Dakota Horizons* do hereby enter into this agreement."

This agreement is similar to previous agreements entered into between the State and GNDA to aid in publishing *Horizons* magazine.

The agreement does not specify the quantity of promotion the state receives in return for its $60,000. The Indiana Supreme Court, in *Indianapolis Convention & Visitors Ass'n,* distinguished *Kneeland* by focusing on the lack of any direct relationship between the money the nonprofit corporation received and the services it rendered. *ICVA* at 214.

"Once the [governmental entity] commits to pay ICVA a certain amount of money for the year, ICVA's performance (or lack thereof) does not directly affect the amount it receives. No effort is made to allocate to ICVA that portion of the hotel-motel tax which its activities helped to generate."

*ICVA.* Here, GNDA receives an appropriation of $60,000 to aid in publishing *Horizons* magazine, with no specified relationship between the quantity of information it disseminates on the state's "natural, cultural, and historical amenities which are appealing to travelers, vacationists, and of all citizens" and the amount of money it receives.

The agreement in the record indicates GNDA began publishing *Horizons,* ran into difficulty, and then requested support from the state for its continued publication. This is not a contract with the state for printing or publishing of state materials. *See* N.D.C.C. § 46–02–09 (printing of "six-class" items, or those documents not specified for governmental use, amounting to over three hundred dollars, must be let by competitive bidding or by solicitation of at least two quotations). Rather, a private entity began the magazine for its own purposes, then requested support after it could no longer support it.

According to the agreement, funds were given to ensure continued publication because *Horizons* is not financially self-sufficient. However, the record also reflects that in 1991 and 1992, the two years prior to the agreement, *Horizons* had revenues in excess

of expenses of $38,268 and $77,095, respectively. The records indicate the excess was not carried over to the next year, and there appears no language in the agreement limiting the use of revenues from *Horizons*. GNDA is apparently free to use this revenue in support of its other undertakings.

In connection with the $60,000 grant, the evidence in the record and its reasonable inferences raise a genuine issue of a material fact as to whether GNDA is supported by public funds and is subject to the open records law. In its letter to the Chairman of the House Judiciary Committee relating to this dispute, GNDA enumerated *Horizons* as one of its "programs which are, in part, supported by public funds." GNDA's September 9, 1993, trial court brief in support of motions acknowledged "there is a fundamental fact issue present, that is whether GNDA is 'supported' by public funds or merely received public funds in exchange for goods and services...." GNDA's net gain on publishing *Horizons*, greater than the State grant, creates a potentially reasonable infer-

2. GNDA raises in a footnote the questionable constitutionality of applying the open records law to open all its records to inspection, quoting Art. I, §§ 8, 16, N.D. Const. Other than the mere quotation of these provisions, GNDA makes no attempt to analyze or argue in support of its contention. A party raising a constitutional challenge must "bring up the heavy artillery or forego the attack entirely." *A & H Services, Inc. v. City of Wahpeton*, 514 N.W.2d 855, 860 (N.D. 1994). We find this is particularly appropriate when two constitutional provisions are alleged to be in conflict. Therefore, we do not reach this contention which Justice Meschke relies upon in his dissent. We note, however, the record before us reflects that GNDA has voluntarily sought both State memberships and the State grant. In this light, GNDA is not different than others who seek State benefit and accept corresponding consequences.

Justice Meschke's dissent engages in contorted statutory construction in an attempt to change the "clear and unambiguous" language of the open records law. *Northern States Power Co.* at 247 (majority opinion by Meschke, J.). The dissent ignores the rules of grammar and twists the open records law so the adjectives "public or governmental," modify all of the named bodies, violates fundamental principles of statutory construction. When interpreting a statute, every effort must be made to give each word, phrase, clause, and sentence meaning and effect. *Stewart v. Ryan*, 520 N.W.2d 39, 45 (N.D.1994); N.D.C.C. § 1–02–38(2). When read as the dis-

ence of general support. In view of the written acknowledgment of support and the Attorney General's opinion that GNDA's records are open, the trial court abused its discretion in denying reasonable discovery when GNDA sought to disclaim support. We conclude the evidence and the inferences favorable to the Adams County Record were sufficient to defeat summary judgment based on the $60,000 grant.

## G

The open records law does not define "record" to indicate what is subject to inspection. We have noted the term "record" should be given an expansive meaning and is not limited to those records which are required by law to be kept and maintained. *Grand Forks Herald* at 578. Further, once it has been determined an entity falls under a category of organization subject to the law, then by the plain language of the provision and statute *all* records of the entity are open to inspection. *Grand Forks Herald*.[2]

sent suggests, the words "public or governmental" become redundant and nonsensical; i.e., "[public or governmental] agencies of the State," "any [public or governmental] political subdivision of the State." We cannot presume the Legislative Assembly meant such an absurd construction.

Justice Meschke contends the Adams County Record did not properly appeal the grant of summary judgment. At the trial court, the Adams County Record vigorously argued there were factual questions, in opposition to GNDA's motion for summary judgment. The Adams County Record moved for reconsideration of the original order and an amended order was issued clarifying the factual conclusions of the court. Although the parties here do not dispute the evidence, they argue different inferences from the evidence.

We are not, as Justice Meschke suggests, measuring the adequacy of the consideration between state agencies and GNDA. We focus on what the state received in return for the public funds expended because a citizen has legitimate access to state agency records. If the state receives little or nothing in return, it is logical for the citizen to look to the organization receiving the public fund to determine how the money was spent. This premise underlies the rationale for requiring a *quid pro quo* to avoid being subjected to our open records law.

Further, Justice Meschke misrepresents caselaw on open records statutes, to attempt to support his argument we are weighing consideration. *Sebastian County Red Cross v. Weather-*

## III

The order of the trial court denying the writ of mandamus is reversed, and this case is remanded for further proceeding consistent with this decision.

NEUMANN, J., concurs.

VANDE WALLE, Chief Justice, concurring in the result.

Notwithstanding that the issues in this appeal were presented to us as pure questions of law without any factual disputes, Rule 35, N.D.R.App.P., authorizes this Court to order the result reached by the majority opinion. Although I do not agree with all the majority opinion, I concur in the result.

Whether or not GNDA makes a profit or loss on *Horizon* magazine is not determinative of whether or not the records of GNDA are open to the public under the applicable constitutional and statutory provisions. If, on the other hand, the funds paid for publication of *Horizon* are simply a subterfuge to give a donation to GNDA, a fact not evident from this record, in violation of Art. X, § 18, N.D. Const., more than the open records provision is at issue. It appears to me from the face of this record that there was a valid *quid pro quo* contract between the State and GNDA, i.e., the continued publication of *Horizons*. If the situation has changed since that original agreement, that should be explored in a fact-finding hearing before the trial court. GNDA may be required to submit its records concerning only the publication of *Horizon* and the funds received from the State for this purpose.

Although I am skeptical that the payment of dues by the State agencies which are not greater in amount than those paid by nonpublic agencies is sufficient to bring the records of GNDA within Article XI, § 6, N.D. Const., I agree it should be considered and that information limited to the organization and structure should be made available through discovery. That limited information

does not include a wholesale examination of GNDA's records.

MESCHKE, Justice, dissenting.

I respectfully dissent. *All* private records of a private entity should not be exposed to random public inspection because the private entity does some business with governmental bodies.

At a hearing on all pending matters, the Adams County Record group entered twenty-one exhibits as evidence of payments by state agencies to GNDA for memberships "and otherwise" (TR 3–4), agreed with the trial court that the question "before the Court is [whether] a writ of mandamus [is] appropriate and, if so, should the relief requested be granted" (TR 5), and, in closing, told the court that "I think the record is full" (TR 21). The trial court denied a writ of mandamus on the record before it, finding and reasoning:

1. GNDA is a private, non-profit corporation.

2. Article XI, Section 6 [the open records law] does not apply since the GNDA does not fall within the definition of a public agency. In addition, an "organization or agency supported in whole or in part by public funds" are those agencies to whom money is appropriated.

3. The mere contracting by an agency for services with a private company does not bring the company within the purview of the foregoing section of the Constitution.

As Chief Justice VandeWalle observes in his concurrence, "the issues in this appeal were presented to us as pure questions of law without any factual disputes."

Indeed, the Adams County Record group did not frame an argument on this appeal that an improper summary judgment had been entered, or that the trial court improperly denied it an opportunity to present evidence for a writ of mandamus. Rather, the

---

*ford,* 846 S.W.2d 641 (Ark.1993), had nothing to do with the amount of consideration exchanged. The holding of the court was based on its interpretation of "public funds." The court held "public funds" was limited to "moneys belonging

to government." *Weatherford* at 644–45. The transaction in question only involved real property. Thus, "no payment of government moneys was made to the Red Cross" and the open records statute did not apply. *Weatherford* at 645.

group stated the question for review as a "straight forward" legal one:

> Whether the receipt of public funds, by way of membership dues from state agencies and legislative grants, constitutes partial support of private organization activities and brings all of the records of the private organization under the purview of North Dakota's constitution and statutory provisions requiring open inspection of records.

The group did not complain on appeal about denial of access to any records on the organization and structure of GNDA, the benefits and services the state agencies received from it, or identifying "support" by public funds to GNDA.

For relief on appeal, the Adams County Record group asked only that "the decision of the trial court be reversed and a writ of mandamus be issued, requiring GNDA to allow inspection of all its records, including the records of the North Dakota Coalition for Liability Reform." Therefore, I believe the question here is one of law: Does the open records law apply to a private, non-profit corporation, one that engages in some business with governmental bodies as GNDA does, to open all of its private records for public inspection?

Justice Sandstrom's opinion begins with some appropriate analyses that I agree with: Interpretation and application of the open records law is a question of law, fully reviewable by this court. "[N]ot every transfer of public funds to a private entity is support" that would subject "every corporation, contractor, and association of the state ... to the open records law each time the government paid for services or goods or awarded a

contract." I also agree with Justice Sandstrom that "[t]his is not the intent of the open records law," that "support means something other than an exchange of services or goods for money," and that "[w]hen there is a bargained-for exchange of value, a *quid pro quo*, the entity is not supported by public funds."

Then, however, Justice Sandstrom's opinion drifts away from appropriate analyses and shifts to an unlikely mode of interpretation: The exchange of value in contracting with a governmental agency must be for "identifiable and specific goods and services," and membership "dues which are for the general support of the [private] organization constitute 'support' for purposes of the open records law." [1] Also, to imply that regular membership dues paid to GNDA by state agencies might be general support and not for the services that each agency gets with its membership, Justice Sandstrom suggests "[t]he only way a taxpayer can see how state funds were used is to access the private organization's records to see how that organization used the money." That notion would open the entire records of every private organization accepting a membership from a governmental body. Absent the well-defined services that Justice Sandstrom expects, a governmental body's membership in a private association would expose its complete records to public inquisitiveness. On this aspect, I agree with Chief Justice Vande-Walle's concurrence that "the payment of dues by the State agencies which are not greater in amount than those paid by non-public agencies" does not convert a private, non-profit corporation into an "organization ... supported ... by public funds." [2]

---

1. I do not read *Kneeland v. NCAA*, 850 F.2d 224, 230 (5th Cir.1988), to support that assertion, as it is cited. That decision determined membership dues used for activities, which the trial court found "vague and amorphous," should "not be considered unrestricted grants for the general support of the NCAA," a private association composed of public and private colleges. *See also A.H. Belo Corp. v. So. Methodist Univ.*, 734 S.W.2d 720 (Tex.App.—Dallas 1987) (monies received by private colleges from Southwest Athletic Conference, an association of public and private schools, are contractual payments and not public funds that would open records for inspection).

2. To interpret the law to open nonpublic or nongovernmental records to public inspection would seriously conflict with constitutional constraints. *See* N.D. Const. art. I, § 8 ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated...."); art. I, § 16 ("Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner...."); art. I, § 5 ("The citizens have a right, in a peaceable manner, to assemble together for the common good...."). A cardinal rule of statutory construction calls for an interpretation that complies with constitution-

The adequacy of the agreed consideration in a contract is not usually weighed by the courts under contract law. *See Maragos v. Norwest Bank Minnesota, N.A.*, 507 N.W.2d 562, 565 (N.D.1993); *Harrington v. Harrington*, 365 N.W.2d 552 (N.D.1985).

> [T]he courts do not ordinarily go into the question of equality or inequality of considerations, but act upon the presumption that parties capable to contract are capable of regulating the terms of their contracts, granting relief only when the inequality is shown to have arisen from mistake, misrepresentation, or fraud. A different rule would, in every case, impose upon the court the necessity of inquiring into, and of determining the value of, the property received by the party giving the promise. Such a course is deemed to be impracticable.

17A AmJur2d *Contracts* § 135 (1991). I know of no reason why a contract by a governmental body should be treated differently.

What's more, under separation-of-powers doctrine, judges should avoid interfering with the discretion of executive agencies expending their funds appropriated by the Legislature, unless there is clear illegality in the expenditure. As with any procurement by a governmental body from a private entity, the governmental body can contract for the necessary private records to be made available for audit, inspection, or filing. The Legislature can specify what private records must be obtained by or made accessible to the agency in carrying out its governmental activity. Indeed, the Legislature has decreed that a member is entitled to inspect the books and records of a nonprofit corporation "for any proper purpose at any reasonable time." NDCC 10–24–25. No doubt that permits a governmental member to do so. The judicial branch should not write a new condition into a governmental body's membership in a private association when neither the governmental body nor the Legislature has done so.

On the agreement by the North Dakota Tourism Department with GNDA for publication of *Horizons* magazine, Justice Sand-

al dictates. NDCC 1–02–38(1): "In enacting a statute, it is presumed that ... [c]ompliance with the constitutions of the state and of the United States is intended."

Governmental regulation (even by a state constitution) that constricts First Amendment freedom can exist only for very narrowly defined reasons. The First Amendment of the United States Constitution protects freedom of speech, assembly, association, and petition that, "though not identical, are inseparable." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (protecting publicity campaign designed to influence legislation in the transportation industry from antitrust regulation); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (invalidating state criminal statute forbidding expenditures by business corporations for the purpose of influencing popular vote on referendums because statute prohibited protected speech in manner unjustified by compelling state interest); *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981) (invalidating an ordinance limiting contributions to a committee formed to support or oppose ballot measures, and declaring "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."); *Federal Election Commission v. Massachusetts Citizens For Life*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (invalidating Federal Election Campaign Act section restricting independent campaign expenditures by nonprofit, nonstock corporation because the section infringed protected speech without a compelling justification). Private records are constitutionally protected from governmental regulation unless the liberty interest is outweighed by a compelling governmental interest and the regulation is narrowly tailored to further that compelling interest.

The Adams County group seeks "inspection of all [GNDA's] records, including the records of the North Dakota Coalition for Liability Reform." Of course, for a compelling governmental interest, with adequate warning through preexisting legislation, the Legislature could probably validly require public reporting of lobbying contributions received by any lobbying entity. *See Northern States Power Co. v. North Dakota Pub. Serv. Comm'n*, 502 N.W.2d 240 (N.D.1993) (private records legislatively required to be filed with a governmental body are public records, unless exempted from public inspection by law); *Buckley v. Valeo*, 424 U.S. 1, 60–84, 96 S.Ct. 612, 654–66, 46 L.Ed.2d 659 (1976) (upholding provisions of Federal Election Campaign Act of 1971 requiring public disclosure of certain campaign contributions and expenditures, "if narrowly construed," as within constitutional bounds).

strom quotes only that contract's recitals and then criticizes the deal because it "does not specify the quantity of promotion the state receives in return for its $60,000," and says it lacks a "specified relationship between the quantity of information it disseminates ... and the amount of money [GNDA] receives." The implication seems to be that the magazine is a flimflam or flummox, rather than a valid promotional effort. Even without copies of the publication in this record, that's an implausible implication.

This curious analysis also infers that, after years of outright losses, GNDA now makes a modest profit on *Horizons,* "there appears no language in the agreement limiting the use of revenues from *Horizons,*" and "GNDA is apparently free to use this revenue in support of its other undertakings." Justice Sandstrom would conclude this permits an inference that "GNDA is supported by public funds and is subject to the open records law," and "GNDA's net gain on publishing *Horizons,* greater than the State grant, creates a potentially reasonable inference of general support."

The operative clauses of the Tourism Department's agreement with GNDA say:

> IT IS AGREED, that the Department will pay to [GNDA] ... $7,500 per issue or a total of $60,000 for the 93–95 biennium to publish *North Dakota Horizons,* subject to the following conditions and limitations:
>
> . . . .
>
> 3. That each payment shall be made to [GNDA] only after publication of an issue.
>
> . . . .
>
> [GNDA] will continue to utilize an advisory board, with representation from the Tourism Department to review and give input to the publication on a periodic basis.
>
> That [GNDA] will furnish to the Department, with documentation to substantiate the expenditures and revenues generated by *Horizons* on an annual basis.

Reports of the magazine's revenues and expenses for the years 1992 and 1991 were produced by GNDA in this lawsuit, and put in evidence as Exhibit 22 by the Adams County Record group at the trial. (Appendix 60). I believe, as a matter of law, there is a clearly valid agreement between the agency and GNDA for publication of the *Horizons* magazine. There is no rational basis here for an inference that GNDA is supported by public funds.

Justice Sandstrom's reasoning on this facet would also unsettle settled contract law, as I summarized earlier. *See also Sebastian County Chapter of The American Red Cross v. Weatherford,* 846 S.W.2d 641 (Ark.1993) (Dollar-a-year lease to Red Cross not a direct allocation of funds for support by public funds that would open all Red Cross records for public disclosure). Once lawfully spent, public funds lose their identity in the hands of a non-governmental entity. *Champ v. Poelker,* 755 S.W.2d 383, 388 (Mo.App.1988). For these reasons, I agree with Chief Justice VandeWalle: "Whether or not GNDA makes a profit or loss on *Horizons* magazine is not determinative" and "from the face of this record ... there was a valid *quid pro quo* contract between the State and GNDA [for] the continued publication of *Horizons.*"

I am puzzled by the suggestion that the *Horizons* agreement might be "a subterfuge to give a donation to GNDA," even though the Chief Justice carefully clarifies that this is "a fact not evident from this record." Fraud on the government is always potential, as in private dealings. But there is a different framework of law and procedure to address mistake, misrepresentation, and fraud. Indeed, fraud has specific procedural rules and heightened proof standards, including NDRCivP 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Adams County Record group made no claim of fraud, mistake, or subterfuge, either in the trial court or in this appeal. I do not comprehend how fraud, pretext, or subterfuge became a question in this case.

Apart from Qui tam actions, where a citizen can be authorized to sue on behalf of the state as well as herself, an individual has no standing to sue on behalf of a governmental body absent an illegal expenditure by the governmental body, an idea that even Justice Sandstrom doesn't assert. *See Krebs v. Board of Trustees of Teachers' Retirement*

*System,* 410 Ill. 435, 102 N.E.2d 321, 326 (1951) ("If the payment is legal, as we have heretofore found, it ceases to be public money in the hands of the recipients."); 63A AmJur2d *Public Funds* § 2 (1984) ("Money legally paid by the state ceases to be public money in the hands of the recipient.").

Ordinarily, support by public funds is evidenced by a legislative enactment, either a direct appropriation or an authorization to a governmental unit to directly transfer public funds or tax revenues to another entity for a public purpose. N.D. Const. art. X, § 12(1): "All public moneys ... shall be paid out and disbursed only pursuant to appropriation first made by the legislature...." *See Menz v. Coyle,* 117 N.W.2d 290, 302 (N.D.1962) ("an 'appropriation' ... is the setting apart of a definite sum for a specific object in such a way that the public officials can use the amount appropriated, and no more than the amount appropriated"). Thus, an organization that receives a direct appropriation from the Legislature, like the North Dakota State Fair, 1993 N.D. Laws ch. 20, § 1, and ch. 32, is one "supported ... by public funds." *Compare* 1993 N.D. Laws ch. 14, § 1, subd. 2, appropriating funds to the Tourism Department, not to GNDA. The trial court concluded here that "an 'organization or agency supported in whole or in part by public funds' are those agencies to whom money is appropriated." In this context, the trial court reached a valid conclusion. I would affirm it.

The conclusion reached by the trial court results from a correct interpretation of the open records law. The adjectival phrase, "all records of public or governmental," modifies each of the bodies named in the open records law. NDCC 44-04-18(1); N.D. Const. art. XI, § 6. Those listed bodies are linked by the repeated conjunction "or." This interpretation results from the ordinary rules of grammar, the usual rules of statutory interpretation, and public policy.

The policy purposes of the open records law were summarized in an early case:

> What the Legislature was attempting to accomplish was to provide the public with the right and the means of informing itself of the conduct of the business in which the public has an interest, in order that the citizen and taxpayer might examine public records to determine whether public money is being properly spent, or for the purpose of bringing to the attention of the public irregularities in the handling of public matters.

*Grand Forks Herald v. Lyons,* 101 N.W.2d 543, 546 (N.D.1960) (marriage license records in county courts are "public" records). These purposes require "public" records to be examined to assess whether "public" money is spent properly. The examination is to identify "public" irregularities in the handling of "public" matters. These purposes are fulfilled by examination of records that belong to or come into the possession of public or governmental organizations. The law does not expressly or impliedly open all of the records of any private organization that does business with public bodies.

This interpretation of the open records law is confirmed by the ordinary definition of "or" as a conjunction: "used as a function word to indicate ... (2) choice between alternative things, states, or courses; (3) the synonymous, equivalent, or substitutive character of two words or phrases; ...." Webster's Third New International Dictionary 1585 (1971). "Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears,...." NDCC 1-02-02. "Words and phrases must be construed according to the context and the rules of grammar and the approved usage of the language." NDCC 1-02-03 (part). The conjunction "or" in Art. XI, § 6 and NDCC 44-04-18(1) should be given its ordinary meaning, construed according to its approved usage, and understood to mean that the adjectival phrase, "all records of public or governmental," modifies the entire list that it precedes. The modifying phrase does not affect private records in private hands.

This interpretation avoids floundering, unbounded, and unprecedented analyses, and it facilitates clarity. I would affirm in all respects the trial court's refusal to issue a special writ to order GNDA to "open for

inspection any and all of its records." Therefore, I respectfully dissent.

LEVINE, J., concurs.