1997 ND 116

**ADAMS COUNTY RECORD, Ashley Tribune, Walsh County Record, Walsh County Press, and Jennifer Ring, Plaintiffs and Appellants,**

v.

**GREATER NORTH DAKOTA ASSOCIATION, North Dakota State Chamber of Commerce, Defendant and Appellee.**

Civil No. 960365.

Supreme Court of North Dakota.

June 5, 1997.

Chad C. Nodland, Bismarck, for plaintiffs and appellants, Timothy Q. Purdon and Thomas A. Dickson, on brief.

Nicholas J. Spaeth, of Dorsey & Whitney, Fargo, and Thomas D. Kelsch (appearance), of Kelsch, Kelsch, Ruff & Kranda, Mandan, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] The plaintiffs, Adams County Record, Ashley Tribune, Walsh County Record, Walsh County Press, and Jennifer Ring (collectively Adams County Record) appealed from a district court judgment denying their request for a writ of mandamus compelling defendant, Greater North Dakota Association (GNDA), to make its records available to them under the North Dakota open records law. We hold the district court finding that GNDA is not an organization supported by public funds and, therefore, is not subject to the open records law, is not clearly erroneous and we affirm the judgment.

[¶ 2] The judgment was entered after a hearing on remand by this court in *Adams County Record v. GNDA,* 529 N.W.2d 830, 839 (N.D.1995). The facts underlying this litigation are extensively discussed in that opinion and will be referred to here only as necessary to an understanding of the issues on appeal.

[¶ 3] Adams County Record asked the district court to issue a writ of mandamus ordering GNDA to provide Adams County Record access to GNDA's records, arguing GNDA is an organization "supported in whole or in part by public funds" making it subject to the state open records law, under Section 44–04–18, N.D.C.C., and Art. XI, § 6, N.D. Const. The trial court granted summary judgment denying the relief, and Adams County Record appealed.

This court reversed the summary judgment in *Adams County Record*, 529 N.W.2d at 835–838, explaining the trial court needed to address material factual issues:

"[W]e conclude the term support, as used in the open records law, means something other than an exchange of money for identifiable and specific goods and services. When there is a bargained-for exchange of value, a *quid pro quo*, the entity is not supported by public funds. As such, those agencies or organizations carrying out business with the state or employed by the state are not subjected to the open records law.

\*   \*   \*   \*   \*   \*

"The Adams County Record's first basis for claiming GNDA is subject to the open records law is by receipt of public funds as membership dues. Approximately thirty memberships were purchased by ten different state agencies or divisions....

"Where membership dues result in 'a *quid pro quo*, in sufficiently identifiable quantities' there is not 'support for the purposes of the open records law.' ... The trial court blocked the Adams County Record's attempt to discover specific information about GNDA's organization and structure. The trial court abused its discretion in denying discovery of this potentially relevant information. We conclude the evidence and the inferences favorable to the Adams County Record were sufficient to defeat summary judgment based on membership 'support.'

"GNDA also receives public funds in the form of a grant originally established to aid in publishing *Horizons* magazine. An appropriation of $60,000 was provided in 1993 to the Tourism Department for this grant. H.B. 1014, S.L.1993, ch. 14, § 1. The Tourism Department, in turn, has entered into a written agreement with GNDA to provide $7,500 per issue, or a total of $60,000 for the 1993–95 biennium, to help publish *Horizons* magazine....

\*   \*   \*   \*   \*   \*

"In connection with the $60,000 grant, the evidence in the record and its reasonable inferences raise a genuine issue of a material fact as to whether GNDA is supported by public funds and is subject to the open records law...."

[¶ 4] Upon this court's remand of the case, the district court held an evidentiary hearing and then made the following relevant findings of fact:

"The law of this case is clearly outlined in Justice Sandstrom's original opinion. From the testimony received, I am satisfied that the issue of whether the member dues paid by the governmental agencies convert the GNDA into a governmentally subsidized corporation have been laid to rest.... In addition to receiving the *Horizons* magazine and the GNDA news, discounts on publications, conferences, seminars, legislative updates, membership surveys and other action undertaken by the GNDA are only part of the ultimate benefits received.... If we are to apply the 'quid pro quo' test, it seems abundantly clear that the membership dues, which are even less than those which are paid by private corporations, are more than amply covered by the services received.... In addition, the financial records of GNDA show that the memberships paid by governmental agencies of all types amount to less than three percent of the total membership receipts of the GNDA. Clearly, it has been adequately shown that membership payments are merely received in exchange for goods and services.

"The issue argued more strongly by the plaintiffs in this case is whether the $30,-000 paid annually to the GNDA for the publication of the *Horizons* magazine brings them within the definition of Section 44–04–18(1) of the NDCC.... Upon examination of the agreement, it seems clear that this does not constitute a contract. There is simply no mutuality of obligation. If the GNDA chose not to publish *Horizons*, they would not receive any money, but the state could not force them to publish....

\*   \*   \*   \*   \*   \*

"Eventually, it appears that the question is whether the state receives a substantial benefit from the publication of *Horizons*.

... I am satisfied that the state receives substantial benefits from the continued publication of *Horizons.*

"Based on the foregoing, I am satisfied that the State of North Dakota receives quid pro quo for their contributions in the form of membership dues and *Horizons* payment and, accordingly, the application for the Writ is in all things denied."

[¶ 5] On this appeal, Adams County Record claims the district court did not properly apply this court's holding in the prior appeal to determine whether GNDA receives support for purposes of the open records law:

"The District Court correctly determined that the 'Agreements' between the State and GNDA did 'not constitute a contract' because '[t]here is simply no mutuality of obligation' contained in these 'Agreements.' ... The District Court's analysis should have ended there....

"The District Court did not stop, however, but went forward and framed the issue before it as 'whether the state receives a substantial benefit from *Horizons.*' ... In so framing the issue, the District Court misapplied the holding of the North Dakota Supreme Court in *Adams County Record I.*"

[¶ 6] Adams County Record's argument reflects a fundamental misunderstanding of the nature of unilateral contracts. Adams County Record asserts inasmuch as the court found "no mutuality of obligation" because GNDA was not required to publish the *Horizons* magazine, the court could not find there was bargained for consideration or a *quid pro quo* between the state and GNDA. We disagree. "Where the party not bound by a contract performs, the contract becomes binding upon the other party or parties." *Kutchera v. Kutchera,* 189 N.W.2d 680, 685 (N.D.1971). Likewise, a binding contract is created where one party makes a promise conditional upon another's performance and the other party performs. *See McGurren v. City of Fargo,* 66 N.W.2d 207, 210–211 (N.D. 1954).

[¶ 7] The Restatement, Second, Contracts, § 45 (1981), explains a binding contract can be created by an offeree's performance, rather than a mutual promise:

"*§ 45. Option Contract Created by Part Performance or Tender*

"(1) Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.

"(2) The offeror's duty of performance under any option contract so created is conditional on completion or tender of the invited performance in accordance with the terms of the offer."

The drafter's comment to this section further explains:

"This Section is limited to cases where the offer does not invite a promissory acceptance. Such an offer has often been referred to as an 'offer for a unilateral contract.' ...

\*     \*     \*     \*     \*     \*

"A tender of performance, so bargained for and given in exchange for the offer, ordinarily furnishes consideration and creates a contract."

[¶ 8] 1 Williston on Contracts, § 1:17, pp. 41–43 (1990), compares traditional concepts of bilateral and unilateral contracts with the Restatement, Second, language:

"Traditional contract doctrine has distinguished between those contracts where each party promises some performance and those where only one party promises performance, the consideration from the promisee being actually given and being something other than a promise. The former contracts are called bilateral, the latter unilateral. Although the distinction is still generally recognized by the courts, and although the first Restatement drafters accepted the distinction as fundamental, the drafters of the Restatement (Second) have taken the position that the distinction was conducive to confusion, and that use of the terms is to be avoided. Nevertheless, even the drafters of the Restatement (Second) recognize that some promises by their terms clearly seek a performance rather than a return promise; and the contract thus

formed is therefore clearly promissory only on one side, and hence unilateral.... Today, although the courts have to some extent accepted the more flexible approach of the Restatement (Second), the terms continue to be used as a shorthand method of describing whether the promisor seeks a return promise or a performance."

[¶ 9] Vol. II, Corbin on Contracts, § 6.1, pp. 197–199 (1995), further explains that mutuality of obligation, apart from legal consideration, is not necessary to create a binding unilateral contract:

"It was once common for courts to state that mutuality of obligation is necessary for a valid contract; that both parties to a contract must be bound or neither is bound; that a contract is void for lack of 'mutuality.' But symmetry is not justice and the so-called requirement of mutuality of obligation is now widely discredited. It is consideration (or some other basis for enforcement) that is necessary, not mutuality of obligation.

"If mutuality of obligation were a requirement for contract formation, unilateral contracts and option contracts would be 'void for lack of mutuality of obligation.' ... But the judges are now following the leading text writers in using the term 'unilateral contract' to mean one that consists of a single binding promise and there is no longer any doubt about the validity of a unilateral contract...."

[¶ 10] Although the district court found there was no mutuality of obligation between the state and GNDA, the court correctly realized, consistent with the above quoted authorities, that even without mutuality of obligation there could be a bargained for exchange of money and services when GNDA accepts the state's unilateral offer by publishing *Horizons* magazine. When GNDA publishes the magazine, the state receives the benefits it seeks and GNDA, in return, is entitled to the promised monetary consideration. A *quid pro quo* exists, and each party receives the bargained for consideration.

[¶ 11] The trial court's findings of fact will not be set aside by this court on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P. The trial court's findings the state agency members of GNDA received goods and services for their membership dues and the state received "substantial benefits" from GNDA's publication of the *Horizons* magazine are supported by the record evidence and are not clearly erroneous.

[¶ 12] The judgment of the district court denying Adams County Record's request for writ of mandamus is affirmed.

[¶ 13] SANDSTROM, NEUMANN, and MESCHKE, JJ., and DONOVAN FOUGHTY, District Judge, concur.

[¶ 14] DONOVAN FOUGHTY, District Judge, sitting in place of MARING, J., disqualified.